## Fisher Estate

*Elvin R. Souder,* for accountant.
*William R. Cooper,* for objectors.

TAXIS, *J.,* April 22, 1976 — The first and final account of Union National Bank and Trust Company of Souderton, trustee, was examined and audited by the court on December 9, 1975.

The reason for the filing of the present account is the death of the life tenant, Lydia Kratz, on December 25, 1974. The trust terminates.

The account shows a balance of principal and income for distribution of $96,873.71, composed of stocks as listed on page two of the account, $96,434.01, and cash.

Objections to the account were filed on behalf of all remaindermen. Objectors seek to have trustee surcharged for losses sustained in the purchase and retention of 445 shares of Fidelity Mortgage Investors (FMI), popularly called REIT securities, which were purchased for $15,969.14 and for which the account states no market value as of the

time of filing the account. Objectors request a surcharge of $15,969.14.

It is objectors' position (1) that the investment was highly speculative and, therefore, unauthorized and (2) that the investment, even if authorized when purchased, was negligently retained.

With regard to the standard of care required of trustee, objectors contend that trustee's performance in handling the investment in question is to be evaluated in the light of a skill superior to that of the average man. A fiduciary is under a duty to exercise a skill greater than that of an ordinary man (a) if the fiduciary *has* greater skill than that of an ordinary man, or (b) if the fiduciary procured his appointment by *representing* that he has such greater skill: Killey Trust, 457 Pa. 474, 477, 326 A. 2d 372 (1974). Trustee argues that there is no evidence in the record of the first alternative and, with regard to the second alternative, trustee represented only that it was experienced, but not that it possessed special skill. (Even this representation, trustee argues, was not proven to have been made to *decedent.*) Without deciding this issue, the court will assume that trustee's performance in handling the investments in question is to be evaluated in the light of a superior skill to that of the average man.

A trustee is not a guarantor or insurer of the trust's success and even the most skillful trustee may not at all times be able fully to preserve principal or to produce maximum income; but if the court finds that in the exercise of its duties the fiduciary failed to use the care and skill required of it, the court may impose a surcharge for any depreciation in the value of the principal or loss of

income: Killey Trust, supra, at 481. However, one who seeks to surcharge a fiduciary for breach of trust must bear the burden of proving the particulars of trustee's wrongful conduct: Killey Trust, supra, at 478.

Questions concerning purchase and retention of investments are governed by section 7302 of the Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508 (No. 164), 20 Pa.C.S. §7302, which provides as follows:

"(a) Specifically authorized. — Subject only to the provisions of the governing instrument, if any, a *fiduciary may* accept, hold, *invest in, and retain,* any of the *investments authorized by this chapter, and shall not be liable for loss* on such investments *so long as he exercises due care and prudence in the performance of his duties in regard to them.* 'Legal investment' or 'authorized investment' or words of similar import used in a trust instrument shall be construed to mean any investment authorized by this chapter.

"(b) Prudent man rule.— *Any investment shall be an authorized* investment *if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital.* The authorization to make and retain investments pursuant to this subsection shall be in addition to, and independent of, authorizations to make investments pursuant to other provisions of this chapter and requirements applicable under

other provisions of this chapter shall not affect investments also authorized by this subsection." (Emphasis added).

Unless, therefore, objectors have proved that trustee did not, in the purchase and or retention of FMI, exercise the degree of judgment and care required of it, no surcharge is to be imposed.

With regard to the purchase of FMI, the record establishes that trustee's trust investment committee twice discussed FMI before it was purchased in the trust. The trust investment committee is composed of active officers of the bank and directors of the bank, and the directors are chosen because of their exposure to investments and their considerable business experience.

Prior to coming up for discussion by the trust investment committee, FMI was studied by members of the trust department, one of whom did the primary research. Murray Y. Alderfer, the primary researcher, was a trust officer and a member of the trust investment committee. He had formerly been a licensed mutual fund salesman. He had also completed several courses in investment offered by banking institutes. Trustee received several investment services, such as Standard and Poor's Investment Advisory Survey, Wright's Investments Service, United Business, and Argus, and these services were surveyed and studied in the formation of the recommendations to be presented to the trust investment committee.

With regard to FMI, an important part of the recommendation was based on what appeared in the January 8, 1973, issue of Standard and Poor's Investment Advisory Survey, which reported, in part, as follows:

"We currently favor the three REITs discussed below, each of which is expected to maintain favorable earnings and asset growth. . . .

"FIDELITY MORTGAGE INVESTORS — This rapidly growing trust completed its third fiscal year of operations in October, reporting earnings of $3.12 a share, up sharply from $2.30 a year earlier. Investing principally in first mortgage construction and development loans, FID should further expand its $172 million mortgage portfolio in coming months, backed by the strong loan organization capability of its adviser, a subsidary of George Washington Corp., an insurance holding company. With over 85% of new commitments being tied to the prime rate, margins should be well maintained, and earnings for fiscal 1973 could rise to about $3.70 a share. *Listed on NYSE last May, the shares (35) are highly regarded for income and long-range growth potentials.*"

Argus also had FMI listed as a good income security and Mr. Alderfer ascertained that FMI dealt in short term first mortgages, commercial and residential, the residential being apartments and housing complexes.

Mr. Alderfer also reviewed information from the Standard and Poor's stock guide, indicating price-range for 1970, 1971 and 1972, the highs and lows of the year, the dividend yield, the price-earning ratio, the years when the dividends had been paid since 1970, the then latest dividend of $.82, payable 12/11/72, ex-dividend 11/24, the total 1972 dividends of $2.98 per share and the new indicated dividends of $3.28 per share on an annualized basis.

Mr. Alderfer then reviewed this recommenda-

tion with his senior officer. Mr. Alderfer was also questioned by trustee's president, who was chairman of the trust committee and who had participated in considerable discussion concerning real estate investment trusts, as to what the services had to say about FMI, particularly Standard and Poor, as to the quality of the people identified with FMI, and concerning the book value of FMI. FMI appeared to be attractive to trustee's president because it had solid value in first mortgages.

The committee to whom this investment was then recommended consisted of seven members of whom four were bank employees. The committee discussed the previous earnings of FMI, its current earnings, the return, and that it was an investment which dealt with, and had solid value in, real estate first mortgages. The committee discussed what the services had to say about FMI, the quality of the people indentified with FMI, and the book value of FMI. The record establishes that the 8.5 percent yield appeared attractive to trustee for this trust since the income beneficiary was very elderly. There is no evidence that FMI was a speculative investment.

The purchase of FMI in this trust was discussed by the trust investment committee at meetings first on January 24, 1973, and again on February 14, 1973, at which time it was formally decided to purchase FMI in this trust. The purchase of FMI was approved by the unanimous vote of the members of the trust investment committee present at the meeting of February 14, 1973.

Based on all of the evidence, the court considers the investment to be an investment purchased in the exercise of that degree of judgment and care, in the circumstances then prevailing, which men

of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital.

With regard to the *retention* of FMI, the recor establishes that after the purchase of FMI in thi trust, Mr. Alderfer (1) followed the price of FMI daily in the Wall Street Journal, (2) reviewed FMI with his senior officer, and (3) together with his senior officer brought it to the attention of the trust committee every month.

He observed that the price dropped slightly prior to October 1973, but attributed the drop to the market actions at that time. Then, in October 1973, the price dropped drastically when FMI in an announcement published in the Wall Street Journal stated that some of its loans were in trouble. Prior to this announcement, there had been no inkling of any problems. Because the article indicated that earnings would increase in the second half of 1974, trustee decided that the securities should be retained. The stock was discussed at the next monthly meeting of the trust investment committee (as it was discussed at every monthly meeting) and, because the earnings projection was good, and because the year-end dividend was still contemplated, and because the book value was $20 per share, the same as the market price, trustee decided that the security should be retained.

At the end of November, 1973, the price of FMI was eleven and one-quarter per share. Again, this security was discussed by the trust investment committee and it was decided that the security

should be retained because the year-end dividend was anticipated and the book value was still around $19 per share.

On December 5, 1973, FMI announced that its trustees voted to omit a 1973 fourth quarter dividend. Again, there was no advance inkling of this, as interim information from the trust was not available. The price dropped to seven and one-quarter. Because of FMI's previous announcement that earnings were expected to increase in the latter part of 1974 and because the book value was still around $19 per share, and because the market price had dropped severely, and because it appeared to trustee that there were indications that the inflationary spiral would decrease and interest rates would decline, thereby helping the building industry, and because no service to which trustee subscribed recommended selling FMI, it was decided to retain FMI. And no one expected that the real estate activity and the building industry would sink so badly. In fact, some of the management of real estate investment trusts and their advisers were purchasing shares of real estate investment trusts in December 1973 and January 1974.

In February 1974, FMI's financial report indicated a provision for possible losses of $7,736,000. By then, the market price of FMI had dropped to five and one-quarter. Trustee discussed FMI and decided to retain FMI because the book value was over $17. And when the market price of FMI fell to $1, trustee decided to retain FMI because of the severe drop in price, the market price still being far below the book value.

The record establishes that, after purchase, the FMI investment was reviewed by the trust in-

vestment committee monthly as a common trust fund investment. These monthly meetings lasted generally an hour to an hour and one-half — sometimes longer. The investment was continuously reviewed and it was agreed by the committee that it would be wise to retain the investment based on the facts available at the time.

When the value of FMI dropped, the trust investment committee watched FMI very closely, but considered reassuring factors such as general market decline, the continuing high book value of FMI, and reassuring statements by FMI management as to the restoration of full dividend policy after about six months. The committee considered the investment depressed by general market conditions and there were no facts available to indicate that it should be sold.

While the price of FMI was dropping, the book value remained well above its market price. There was no information available to trustee to indicate that the high quality of the asset was changed in any way. Trustee considered the inherent value of the asset to be the same, although the market price was going down.

Kenneth D. Campbell, an expert analyst in real estate investment trusts (including FMI), testified on trustee's behalf. This expert witness is the principal founder and principal shareholder of an independent advisory company registered with the Securities and Exchange Commission. His company has an advisory service, published monthly since March 1970, on the securities of real estate investment trusts.

Mr. Campbell explained that real estate investment trusts became popular after 1960, at which time a real estate investment trust was granted a

tax exempt status if it paid out 90 percent of its earnings. Thereafter, investors were afforded a ready opportunity to purchase a fractional share of first mortgages.

Mr. Campbell supported trustee's determination that FMI basically made secured first mortgage investments in a high proportion of residential real estate with a diversified portfolio throughout the United States. The testimony of the expert witness also established as reasonable, trustee's judgment to retain FMI based on (a) the substantial book value of FMI, and (b) general economic and financial conditions causing the abnormal depression in the value of FMI.

Prior to FMI's collapse, prices of real estate investment trusts *held* around book value, even in the face of general distress in the economy. Security analysts concluded that it was reasonable to use book value as one of the bench-marks on pricing because secured mortgage holders had a very prior position in any kind of distress situation, and the possibility of loss of principal was relatively minor. Security analysts, therefore, ascribed a great deal of value and significance to the book value of FMI and it was therefore reasonable for trustee to do so.

As to the general economic and financial conditions causing the abnormal depression of the value of FMI, the testimony of Mr. Campbell established that a combination of high interest rates, the oil embargo, and inflation caused the abnormal depression of the value of FMI, caused construction costs to go up and the effective purchasing power of buyers and renters to decline. As a result, buildings became uneconomic and real estate activity and the building industry collapsed. It was there-

fore reasonable for trustee to retain FMI rather than to sell it at a sacrifice, at a time when FMI's value was depressed by general economic and financial conditions. This is especially so where the book value of FMI far exceeded its market value.

Considering all of the evidence, the court concludes that FMI was retained by trustee in the exercise of that degree of judgment and care, in the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital. There is no evidence that retention of FMI was due to speculation on the part of trustee, there being no indication in the record that trustee was holding FMI in order to receive a better price than the shares of FMI were reasonably worth. Rather, because the market value of FMI was generally below the book value of FMI, trustee acted reasonably in deciding not to sell FMI at a sacrifice, but to retain it until it could be sold at its true value.

After careful consideration of all the evidence, the court concludes that objectors have failed to prove the particulars of any wrongful conduct on the part of trustee. Accordingly, the objections are dismissed.

The balances of principal and income are awarded as set forth under the last paragraph of the petition for adjudication.

Power and authority are given the accountant to make the necessary transfers and assignments of the unconverted investment securities.

The account is confirmed, and it is hereby or-

dered and decreed that Union National Bank and Trust Company of Souderton, trustee, as aforesaid, forthwith pay the distributions herein awarded.

And now, April 22, 1976, this adjudication is confirmed nisi.